The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. Whenever you're ready, Judge Newman. Okay, thank you and good morning, everyone. We will proceed with the first case. That's number 191400, Prosperity Tieh Enterprise Co. v. United States. Mr. Cameron, please proceed. Thank you, Your Honor. This is Don Cameron on behalf of Prosperity. This appeal concerns an anti-dumping investigation of corrosion-resistant steel from Taiwan, where Commerce initially limited its investigation to the two largest producers-exporters, Prosperity and Yihui, which we refer to as YP. Prosperity and YP are the only major producers of core in Taiwan and are fierce competitors. The other producer involved in the investigation was SIN, a very small producer that did not even export core to the United States during the investigation period. In the preliminary determination, Commerce found that Prosperity was not dumping based upon an evaluation of its own individual sales and cost data and thus should be excluded from the anti-dumping order. This individual examination is consistent with 19 U.S.C. 1677-1C, which states that Commerce should normally calculate separate dumping margins for each investigative producer based upon their own pricing behavior. For the mandatory respondent, YP, Commerce calculated a combined dumping margin with SIN based upon Commerce's conclusion that YP and SIN should be collapsed. In the final determination, Commerce decided instead to collapse Prosperity with the YP-SIN entity. However, in doing so, Commerce focused solely on the relationship between Prosperity and SIN, not the relationship between Prosperity and YP or the relationship between Prosperity and the YP-SIN collapsed entity, of which SIN is only a small part. What difference would it make if they had focused on the collapsed entity, as you argue they should have? It's a practical matter. How would that have changed the analysis? We're concerned here about manipulation. How would treating the question as being the combined entity bear on the question of manipulation? Well, as we describe in our brief, Your Honor, when you analyze Prosperity in relationship to the combined entity, the quote-unquote intertwined relationships are minuscule. Prosperity, their ownership is approximately 1% of the combined entity. The interaction with SIN was minor in itself, but when it's with the combined entity of YP-SIN, it's in the hundreds of decimal points. Is it a 20% ownership relationship without the combined entity? The 20% is only with SIN, which is a small entity. With the combined entity, Prosperity's ownership interest in the combined entity would be less than 1%, or approximately 1%, because SIN is such a small part. They're such a small company. This was the linkage between these two huge companies, and this is the only analysis that Commerce did. And that actually is the main point. They basically bootstrapped their analysis of SIN, which was a minor player in the market, and then collapsed the two major players into a combined entity. And, of course, they found that this created a, quote, significant potential for manipulation of prices and production. Well, another thing that the Commerce Department found and investigated at verification was that Prosperity had divested itself, even of the 20% investment that they had in SIN that you're referring to. Now, this was after the POI, but it was before any anti-dumping duty deposits, and it was verified at the verification. So by collapsing... I'm still not entirely following this. The result of collapsing SIN with the other entity is not that they become a single entity. It's just that they're treated that way for purposes of anti-dumping. Why does the fact that the collapsing occurred with respect to those two entities make it more likely that Prosperity would or would not be able to manipulate the flow of goods so as to avoid anti-dumping duties? Well, first of all, your honor's point goes to the fact that it does look into the future. But secondly, what Commerce did was they took Prosperity and said, we are going to make this a collapsed entity altogether. And this raises the question, how is Prosperity going to manipulate prices and production of SIN, number one, once it has divested itself, and number two, when the actual management of SIN was controlled by YP, their major competitor. So your argument, this is Judge Raymond, your argument is that Commerce was obligated to analyze Prosperity with the single entity, YI and SIN. Correct, your honor. Okay, and what is it that you think Commerce should have done? Should they have gone back to the regulation and to 351-401-F and conduct that analysis anew? Well, your honor, I think that they should have. That regulation speaks of these producers, which is all producers, number one. Excuse me? Okay, well, I ask that because it seems to me that under, first the statute, then the regulation, there's nothing that prevents Commerce from making these type of multiple collapsing, you know, as long as it goes through the analysis each time it does this. And so I'm trying to understand what is it that you think went wrong here? Assuming I'm correct, that they can't do this, what went wrong? We believe that by doing only, by looking only at SIN, they lack any context, and therefore the analysis itself was improper. And since the entire analysis is focused on looking at whether or not there's a significant potential for price or production manipulation, it's very difficult to get there if you're only looking at a small slice. I see that I'm already into my rebuttal. Now, please continue. This is the point that I think is troubling all of us to try and understand what difference it makes, and also in terms of duties for past importations, how any change in the ownership structure might affect that. So please continue to answer Judge Rainer's question. Thank you, Your Honor. Well, number one, it didn't have any impact whatsoever on the past. It would only affect the future. And, of course, the regulation speaks to the future. And with the divestment, there was going to be no future because no anti-dumping duty deposits had been collected. Okay. So this is, I guess, so when the collapsing occurs, are we saying that the result of the collapse is a new creature? Obviously, it's a single entity now. Two entities are collapsed, single entity. But is that single entity, the resulting single entity, is that a new creature that must itself be subject to the regulatory analysis? Absolutely, Your Honor. And once they collapse, that whole entity is looked at. That's what created the dumping margin in the first place. In other words, instead of just looking at prosperity, home market, and export prices, it's prosperity's home market prices combined with Yafui's home market prices and Sin's home market prices. And then we will compare all of Yafui and all of prosperity's export prices to that combined entity. So you are creating an entire new entity. But why is the fact that there was, in your view, a new entity created, means that Congress can't appropriately also focus on the relationship between prosperity and the original Sin? Why does that become irrelevant to focus on that separately from the so-called combined entity? My apologies, Your Honor. I'm not suggesting that they're not allowed to analyze Sin. But the question is, it's the Commerce Department that says that we're going to take into account the totality of circumstances. And how can you analyze the totality if you're going to take a small slice of the enterprise? For instance, look at the ownership. In the case of the ownership, prosperity owned 20% of Sin. And yet, when you look at the combined Yafui-Sin entity, it was 1%. That gives you an idea of exactly what the potential for manipulation was. And since the entire regulatory structure speaks of significance, and the significance of any potential, that's what demonstrates that the potential was not significant. So that is our position. All right. Let's continue, and we'll save you rebuttal time. And let's see. Ms. Slater, are you proceeding? Thank you, Your Honor. Ms. Slater, are you ready? Yes, I'm just unmuting myself and going to non-speaker phones so that people can hopefully hear a little bit better. Okay. I hear you clearly. Wonderful. Thank you. Good morning. My name is Kelly Slater. I am with Appleton Love Law Firm, and I represent Plaintiff Appellant Yafui Enterprise Company. I'd like to thank the Court for this opportunity to discuss this case under these truly extraordinary circumstances. I'd like to start with a discussion about the difference between the definition of affiliation, on the one hand, and a test for collapsing, on the other, in the dumping statute and the Department of Commerce's regulations. Affiliation is merely one factor in Commerce's collapsing test. That is to say, affiliation has a much narrower focus on static linkages among companies. Those arise from relationships that include family relationships, which are static, shared officers or employees, shared stockholders, or shared control over an entity. Now, control is a term that is loosely defined and applied on a case-by-case basis. Now, the collapsing regulations reach much further. Beyond affiliation, they require a finding that operations between companies are actively intertwined, such that it would give rise to a significant potential of price or production manipulation, such as through the sharing of sales information, mutual involvement in production, pricing decisions, the sharing of facilities, or significant transactions between the affiliated parties. But isn't that really asking too much of the investigation as to what's active and what's inactive when there is, if there is, in fact, a sufficiently significant ownership relationship? It goes beyond ownership interest. The collapsing standard, if I understand you correctly, Your Honor, it's about active participation across the businesses. That is sort of why I couched it in this way, static linkages versus active linkages, active participation in the company's respective businesses. Okay. Well, how do we know that Commerce erred in the inferences that they drew? In terms of what's active or inactive, accepting the premise of a significant ownership interest, such as 20%. Again, I'm trying to draw the distinction between the affiliation standard and the collapsing test. And those are two different considerations. Affiliation is maybe sort of a tip-off point to collapsing analysis, but it is not the final analysis. It's just one start to the analysis. This is Judge Reynolds. I think we understand that. We understand the difference between the affiliation under the statute and then collapsing under the regulation. You were saying, though, about finding active manipulation or price or production, but is that really accurate? Isn't it that the factors in the regulation are designed to find a significant potential for manipulation? I'm sorry. Please proceed. I'm trying to turn up the volume. Hold on. I had a little bit of trouble hearing you. Sir, would you please repeat your question, Your Honor? Okay. In your argument, you were saying that the collapsing regulation must lead to a finding of actual manipulation or active manipulation or price or production. That's what I understood you were saying, but is that really accurate? I mean, in United States Steel versus United States, we said that it's a significant potential for manipulation or price or production. In the China Steel case, sir? In United States Steel Corporation versus United States Corporation, that's 1114. That's a CIP case. But anyway, in that case, this stands for the proposition that commerce doesn't need to find all the factors in the regulation present to find, quote, a significant potential for manipulation or price or production. And you seem to be arguing that the factors must find active and active manipulation. Ongoing. Anyway, let's continue. An active connection, active business interactions with the company such that they have the possibility to influence one another as opposed to something on paper that is more static, like a family relationship. Affiliation is my argument, or at least our argument, is that affiliation is the first step in the collapsing test. But commerce's responsibility of commerce is bound by statute to look further, or bound by at least their regulations to look further into actual active evidence of intertwined operations, like Mr. Cameron was referring to earlier when he talked about verification and how minuscule the actual actively intertwined operations between these companies really are. Okay.  I understand. Thank you. Okay. Okay. All right. Let's hear from the other side, and we'll save the rebuttal for you as well. Thank you. Okay. We're ready for Mr. Schneiderman. Thank you, Your Honor. I thought Ms. Speck would proceed first, and then I would follow up. Whatever you prefer. Yes, Your Honor. Elizabeth Speck for the United States, and may it please the Court, we respectfully request that the Court affirm the trial court's decision, and I'm here only to argue about the collapsing analysis. We did not participate in the cross-appeal. Your Honor, as we- When you collapse SIN and YP, you're doing that because there's a potential for manipulation as a result of the control that YP might exercise over SIN. Is that correct? Yes, Your Honor. Here, Commerce found an independent factual basis to collapse YP and SIN and an independent factual basis to collapse Prosperity and SIN. Okay, but if the question is whether Prosperity can control SIN and use it to manipulate, why isn't it important that Commerce also consider the combined entity of SIN and YP in that analysis, which it declined to do? Your Honor, Commerce explained this, and this is at appendix page 39, that the regulation doesn't require any particular sequencing and that doing a particular order would overlook the evidence supporting collapsing as between Prosperity and SIN. And so here, Commerce felt that even if the other two, YP and Prosperity, couldn't be collapsed, and again, this is explained at appendix pages 39 through 40, it was appropriate to look at collapsing the case based on the potential of those two companies to control SIN. I'm having trouble understanding that. If you're interested in the question of control and potential manipulation, why wouldn't you consider the relationship between Prosperity and the combined SIN-YP entity? Your Honor, as Commerce explained, that would overlook the – I mean, here we have companies that it's undisputed that YP and SIN should be collapsed, and there is substantial evidence in the record supporting that Prosperity, PA, and SIN should be collapsed. And so Commerce was looking at the ability of these various companies to shift production, and the fact that – Yeah, but I don't think – I'm sorry, I don't think you're answering my question. My question is why are you not interested in whether Prosperity has the ability to manipulate price or production potentially with respect to the combined entity, as well as looking at the Prosperity-SIN relationship? Why don't you look at the combined entity because you consider that they should be collapsed, that is, SIN and YP? Your Honor, as a threshold matter, the regulation does not – the statute does not address this at all, and the regulation does not require – Yeah, but I'm asking you to tell me as a practical matter, why do you ignore the relationship between Prosperity and the combined entity? Why? What's the justification for that? The justification, as explained in 39-40 in the appendix, is because it would overlook the evidence supporting collapsing Prosperity and SIN, and it would overlook – basically, the idea here is that these two companies had the potential to control SIN, and that was, again, looking at each individual factual basis as Commerce is permitted to do under the regulation, which doesn't require any particular aggregation or otherwise require a particular order or sequencing. This is Judge Reyna. I'm also finding it a little – I'm unable to understand why the collapsing process, the different steps to examine, to analyze, to collapse, why that didn't happen when you collapsed Prosperity and the other two companies that came out with the single entity. It seems to me you skipped it. You leapfrogged your own regulation. No, Your Honor. We respectfully submit, yes, Commerce did initially collapse YP and SIN, but Commerce explained – and this is in the appendix at 12817 – that it would continue to examine whether to collapse Prosperity TA, and Commerce then – again, Commerce is – preliminary determination is merely preliminary, and Commerce can change its mind so long as it provides a reason for doing so. Here, the appendix at 17570-74 explains the parties were aware that Commerce would be looking at this, and Commerce explained the reasons why, again, the potential for each of these companies to control SIN in its final determination, and that is at 17575-76, and then also it was extensively dealt with in the remand determination. And so, again, the fact that this was preliminarily at that time Commerce hadn't conducted verification, and this Court – you haven't incited these cases, but certainly can if the Court would like supplemental briefing. A preliminary determination is just that. It does not obligate Commerce to follow a particular order or sequence or to aggregate YP and SIN when looking at its ultimate collapsing determination. But why wouldn't you look – when you're trying to decide whether Prosperity can control SIN and cause manipulation, why do you ignore the relationship between SIN and YP, which has been held to be sufficiently close, but they've been collapsed? Why would you ignore that? Your Honor, because it would overlook the potential for manipulation between Prosperity and SIN. Here, we would submit substantial evidence in the record to the Court that there – significant potential for manipulation between Prosperity and SIN, the significant ownership. Yeah, but nobody's suggesting that you can't look at the relationship between Prosperity and SIN. The suggestion is you also need to look at the entire relationship, the totality of the circumstances involving YP as well. Yes, Your Honor, but this is a Commerce – again, because the regulation does not – the portions of the FQ that the appellant cite, again, do not require that type of aggregation. They cited that the Secretary will treat two or more affiliated producers as a single entity where those producers – that language simply doesn't require an aggregation or a sequencing. And here, again, given the significant discretion that Commerce has afforded in this area, with this list of non-exhaustive factors, Commerce only needs to determine a reasonable approach. And here, even if the Court would have perhaps done it differently, it does not render Commerce's approach, looking at the ability of these two companies to control SIN, unreasonable. Or each company individually on an independent factual basis to control SIN and examining the significant potential for manipulation under the totality of the circumstances. And, Your Honor, I wanted to address briefly – Your Honors, I wanted to address briefly the argument – both appellants have highlighted this idea that they were – that Prosperity subsequently divested its share of SIN. And, again, as the trial court recognized and as Commerce explained in its remand redetermination, this did occur after the period of investigation. Here, the period of investigation was April 1st, 2014 through March 31st, 2015, and the divestment occurred in December of 2015. Commerce has an established practice of not looking at the post-period of investigation activity for purposes of collapsing. And, again, the only way Commerce can depart from an established practice is to identify compelling reasons to do so, and none have been presented here. And here, it's appropriate, as Commerce also has a longstanding practice, to look at the information presented in each segment of the proceeding, which Commerce did inappropriately examine the divestment during the first administrative review. So, your theory, then, is that this would be relevant for administrative review but not retroactive? Yes, Your Honor. Again, that would be at odds with Commerce's established practice of only looking at information during the period of investigation for purposes of collapsing. That was cited on page 33 and 34 of our brief with steel concrete reinforcing bars from the Republic of Korea. And, again, the policy, in part, is collapsing is forward-looking, but it's also to ensure, as explained in the Queen's Flowers case, that Commerce is examining the entire entity during the period of investigation, and that is what Commerce has done here. Again, I don't believe the appellants have identified any record information suggesting that this was brought up anywhere other than at verification, and, again, it was post-period of investigation, which wouldn't have meaningfully given Commerce time to examine the arm's-length nature of the transaction, and that's why it's more appropriately done during the first administrative review. Okay. Does the panel have any more questions for Ms. Speck? No. Okay. Then we'll hear from Mr. Schneiderman. Thank you, Your Honor. I'm Dan Schneiderman. I represent AK Steel, which is a defendant in a cross appellant. I'd like to start by addressing the collapsing issue and then move over to our cross appeal. I'd like to start by mentioning that I agree with the government that collapsing decisions, we're dealing with a concurrent analysis of collapsing three entities. Nobody complained when the government analyzed the relationships between Yifui, YP, and SIN independently. It didn't consider PT as part of that analysis. In other words, it considered each of these relationships independently, and it decided to collapse YP with SIN. It did the same analysis with YP, with Prosperity and SIN, and I think it's appropriate. You know, the question came up about manipulation. In this case, it was demonstrated that during the POI, SIN and Prosperity engaged in, it had very highly intertwined operations in the sense that when SIN's operations were down, they were able to shift production to PT. In other words, those two entities were effectively acting as a coordinated unit in terms of their production. And this gets to the heart of why collapsing is important for purposes of the dumping calculations. When you have entities that are acting as a coordinated unit, it's very important that, and they have the ability to shift production among their various facilities. You don't want to assign different dumping margins to those different facilities because what you'll find is that those facilities can just shift production and supply the U.S. market from the facility that has the lowest rate. So, for example, in this case, if you were to assign a separate rate for SIN and Prosperity, the entities could shift production among them and supply the U.S. market from the facility with the lowest rate. So, that's sort of the potential for manipulation that we're concerned about, and that's the reason why it's appropriate to have a single rate assigned to both. And I would point out that, you know, once you've decided that SIN has to be collapsed with both of its owners, in other words, with both YP and PT, you've already essentially created a tripartite entity. There's no further requirement for Commerce to analyze the intertwined operations between YP and PT independently. And, in fact, I don't even think anybody suggested Commerce did that analysis. This is Judge Rayner. I don't understand why that's the case. It seems to me that if you're looking to collapse entities, you go to the regulation, and the regulation is pretty clear what type of what degree of the relationships between the different entities have to be in order for them to be collapsing. You seem to be arguing that you can only rely you can rely on an indirect relationship in order to collapse entities. And it seems to me that the regulation requires more than that. Well, Your Honor, thank you. I believe the regulation would require in other words, if you've already decided that based on the relationship, SIN has to be collapsed with two other entities, then you've already created one tripartite entity. In other words, and this happens frequently where you have, for example, one respondent with multiple subsidiaries. Commerce analyzes the relationship between that respondent and each subsidiary. I don't think it engages in a separate analysis looking at each subsidiary relative to each and the intertwined operations there. So I think once you've created a group, I don't think there's a requirement and they're all properly collapsed on that basis. I don't think there's a further requirement to look at each member within the group relative to each other. Are you saying that Commerce doesn't have to even justify its decision to collapse multiple entities? Well, I mean, I think it did. Certainly, nobody's complaining that SIN was collapsed with Yifui. And again, without considering PT as part of that analysis, I don't see then why it should be any different when SIN is collapsed with YP. And again, all three entities can shift production through SIN. In other words, if different margins are being applied to the different entities, both YP and PT can shift their production to SIN in order to manipulate production and essentially manipulate the dumping margin. Well, let me give you a hypothetical. Suppose YP decides to funnel its production through SIN. Isn't that possible that it might make it more difficult for Prosperity to funnel its production through SIN? Isn't that a potentially relevant consideration? Well, Your Honor, I mean, presumably both entities could funnel their sales through SIN. Isn't it possible that if YP is controlling SIN and using it to funnel production, that that might make it more difficult for Prosperity to funnel production through SIN? Well, presumably the three entities, all of which are affiliated, would be acting in concert and making decisions about the most efficient way to circumvent the U.S. dumping laws and avoid dumping to the maximum extent possible. Presumably that coordination would take place at that level. And presumably, even if there are capacity constraints, I could understand that the entities could engage in tolling arrangements such that ultimately SIN is the exporter but the other two would toll for it. So there are many ways that that could be worked around, knowing that these are all affiliated companies. The appellant says that this is really speculative and that Commerce needed to determine what was actually happening, not just what the potential might be. Is there an answer to that? Well, there is. And the Commerce found that there was actual intertwined operations both between YP and SIN and between PT and SIN. And if I could just briefly address the cross-appeal issue, Your Honor? Yes, please do. Okay. This addresses the yield strength characteristics, which was misreported by Prosperity. And just a little bit of background, corrosion-resistant steel is sold to industry standard specifications, which are set by organizations like the ASTM. And there's actually a field that's required to be reported by all respondents, which is called the specification field, which requires the reporting of the ASTM or industry standard specification. PT actually properly reported the industry specifications in that field. So, for example, you'd see an ASTM 8653 SS80. The SS80 indicates the minimum yield strength, ASI. Go ahead. Continue. The questionnaire is very clear that when there's another characteristic, which is called the yield strength characteristic, the questionnaire was very clear that the respondent had to use the industry specification as the basis to report the yield strength. And it says, and I quote from the third paragraph of the instruction, it says if no requirements or guidance on minimum specified yield strength is included in the specification of the product in question, end quote, then the respondent has to resort to some other method to report the yield strength. Here, there were six specifications, all six of which were ASTM industry standard specifications, most of which said SS80 in the title, which has the minimum specified yield strength in the specification itself. The plain language of the question required that they report on that basis. And PT said, well, when we reported the yield strength, we didn't look to the industry standard. We looked to our internal mechanical property code, which showed that for these specifications, we actually made these to a stronger strength characteristic, in other words, exceeding 80,000 PSI, and that's how we reported it. But the problem is that the questionnaire requires that they report based on the, quote, specification, not some proprietary internal code. Now, I understand that the trade court below suggested that the meaning of the term specification in the questionnaire was itself ambiguous, and that it could just as easily refer to a manufacturer's internal specification rather than the industry standard. But this doesn't make any sense because the term specification was already defined up above in the questionnaire. Again, there's a separate field in the questionnaire for specification, and PT properly reported those specifications using the industry standards. But how did that affect the result if they actually had a stronger product than the specification? Your Honor, you're right. If a product has a specified minimum yield strength of 80,000 PSI, you're always going to produce that product with something exceeding 80,000 because 80,000 is the minimum threshold. The actual strength is almost always going to be quite a bit higher than that. But the way commerce required these products to be coded for anti-dumping purposes is that you report the minimum specified. In other words, even in their actual records, the actual strength may be significantly higher than 80,000, but you weren't supposed to code it that way. In other words, you don't code based on the actual strength. You code for purposes based on the specified minimum strength. How would this affect the dumping margin? That's what I don't understand. Well, it's very important, Your Honor, because for the six specifications at issue, they should have been coded in a category of products with a minimum specified yield strength of 65,000 up to and including 80,000. In other words, that's part of the condom. It's one grouping. But Prosperity didn't report it that way. In fact, it took these six specifications and it placed them into a separate grouping of other products that had a minimum specified yield strength over 80,000 PSI. So, in other words, it just coded these products into the wrong grouping. And so, as a result of that, the condom was incorrect, and as a result, Commerce did not have correct cost information for those condoms. In other words, there was a gap in the record. And, of course, the trade court ultimately found, well, no, there's no gap because Prosperity didn't misreport in the first place. But Commerce's finding of the misreporting clearly is supported by The questionnaire is clear that you have to report the minimum specified yield strength based on the specification at issue. And the specification can't mean the industry standard at field 2.3, which is at appendix page 5202, and then mean the internal manufacturer code at field 3.7. And, in fact, if you look at PT's response, it's very clear that they understood the AFTM spec for each of these, and they even reported in their chart that the minimum specified yield strength for each was 80,000 PSI. I think they just made a mistake, and what happened was they accidentally relied on their manufacturer code, which indicated an actual yield strength, in lieu of the industry standard, which they were supposed to use. And, as I said, as a result, that was discovered at verification, and there was a resulting gap in the record. So, our position is that there was a misreporting, and that Commerce's finding that there was a misreporting is supported by substantial evidence. Okay. Any more questions for Mr. Schneiderman? Then we'll proceed with the rebuttal. Thank you, Your Honor. Let's see. Okay. Mr. Cameron. Thank you, Your Honor. Don Cameron. First, let me address the yield strength. Yes. They state that the Commerce instructions, quote, very clearly require the reporting of the applicable minimum specified yield strength as published by the standards organization, such as ASDM, unquote. Well, it's interesting that in none of their briefs do they entirely quote the questionnaire in question, because it's not true. It doesn't say that. As the lower court correctly found, the instructions do not say that, and the lower court gives the entire instructions, and it doesn't require Prosperity to use a standards organization. They say that our manufacturing code is an actual yield strength. No. It specifies our minimum yield strength, and it says the minimum yield strength for that yield strength is greater than 80,000. What we are discussing here is the difference between equal to 80,000 or greater than 80,000 as a minimum. And, yes, that's correct. Our minimum standard in our internal code was greater than ASTM, because it was a more stringent standard, and that is exactly what we reported. So that's the way PT understood it. It followed its manufacturing property code. It was verified by Commerce. There was nothing that wasn't verified by Commerce. The applicable code that we used was also verified, and it was greater than 80,000 PSI, and the Commerce Department verified that as well. So the only issue before this court is whether Commerce, quote, clearly instructed, as Petitioner contends, that respondents use minimum, yes, specified yield strength based on the standards organization, such as ASTM and not internal standards, and it didn't. And to suggest that the manufacturer code that we use is somehow an actual yield strength ignores the exhibit. The exhibit clearly says that it's greater than 80,000. Heck, we had yield strength that went up to 120,000 PSI, and the whole purpose is to be able to compare like-to-like products. So that's our answer to that, and we did lay it out in our brief. If I could just very briefly address, respond to the government, unless there are other questions on this, I apologize. No, proceed. Thank you. The government suggests that, well, the reason that we didn't analyze P prosperity in relation to the YPCM entity is the regulations don't require us to do it, and we follow the regulations and do what we have to do. And we don't agree with that, Your Honor. We believe that the regulations do require that. The regulations say those producers, what are those producers? Those producers in 401, in what is it, 401, 351-401F, those producers are the producers to be collapsed, right? It doesn't say some of the producers that are to be collapsed. It doesn't say you can analyze part of what you're going to collapse. It says those producers, those producers that you were going to collapse, and Commerce didn't do that. Secondly, it says, and there is a significant potential for manipulation of price or production. Well, let me ask you a question. Does it, I'm sorry. I thought I heard a question. No, please continue with your thought. All I was going to say was when you're looking at the potential of price manipulation, it makes a huge difference, whether you are looking at a figment of the collapsed entity, i.e., SIN, of which, yes, we agree, we own 20% of SIN, or the collapsed entity that Commerce collapsed us into, which was the YPCIN entity, of which that ownership interest became 1%, and any interaction that we had was minuscule. Thank you very much. I appreciate your time, your patience, and the trying times that you're going through. Thank you. Okay. Thank you. Now, Ms. Slater, you have one minute. Hi, this is Kelly Slater. I think the judge made, one of the judges at least, I'm not quite sure which one, but the idea that Commerce leapfrogged the regulations is particularly interesting, and I just want to follow up on that. The policy behind Commerce's collapsing test in trade investigations is to prevent the potential manipulation of price and production between affiliates, especially if one affiliate receives a more advantageous dumping rate over another. This policy would not be useful if the affiliates are not found to be dumping when the dumping calculation is done individually for each company. In Commerce's preliminary analysis, neither Prosperity nor Yale Quay were found to have engaged in dumping. So, collapsing these three entities was the only way for Commerce to achieve an affirmative dumping order on corrosion-resistant steel products from Taiwan. Without that element of Commerce's decision, we would not even be here arguing today. Thank you. Okay. Thank you. Any more questions from the panel? All right. Then this case is submitted. Thank you all. Thank you.